UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

JOANNE JAFFE,

                              Plaintiff,

-against-

CITY OF NEW YORK, POLICE COMMISSIONER JAMES O'NEILL, and FIRST DEPUTY POLICE COMMISSIONER BENJAMIN TUCKER,

                              Defendants.

------------------------------------------------------------------------x

**DECLARATION OF DONNA A. CANFIELD IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO BAR THE CITY FROM INTERFERING WITH PLAINTIFF'S ACCESS TO WITNESSES AND EVIDENCE AND FROM REPRESENTING NON-PARTIES WHO ARE NOT CITY EMPLOYEES**

19 CV 7024 (LAP)

**DONNA A. CANFIELD** declares, pursuant to 28 U.S.C. § 1746 and subject to the penalties of perjury, that the following is true and correct:

       1. I am an Assistant Corporation Counsel in the office of Georgia M. Pestana, Corporation Counsel of the City of New York, attorneys for the Defendants in the above-captioned action.

       2. I submit this declaration in support of the Defendants' opposition to Plaintiff's motion to bar the City of New York from representing non-party, non-employee witnesses and to direct Defendants to comply with discovery obligations.

      **I.**    **Procedural Background**

       3. On July 26, 2019, Plaintiff filed her Complaint. *See* ECF No. 1.

       4. On August 8, 2019, Plaintiff filed an Amended Complaint. *See* ECF No. 10.

5. On September 30, 2019, Defendants filed an Answer to the Amended Complaint.  *See* ECF No. 22.

6. On November 4, 2019, the parties participated in mandatory mediation, pursuant to the Second Amended Standing Order.  *See* ECF Nos. 24-25.

7. On November 6, 2019, the final Report of Mediator was filed, indicating that "the court-ordered mediation in this case was held but was unsuccessful in resolving any issue in this case."  *See* ECF No. 28.

8. On January 9, 2020, after several scheduling conflicts with the Court, the parties appeared for an Initial Pretrial Conference.  *See* ECF Docket Sheet.

9. On February 4, 2020, the Court approved the parties proposed Civil Case Management Plan and Scheduling Order.  *See* ECF No. 33.

**II.     Document Discovery**

10. On or about February 14, 2020, the parties exchanged Initial Disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1).

11. On or about February 18, 2020, Defendants served their First Set of Interrogatories of Document Requests.

12. On or about February 26, 2020, Plaintiff served her First Set of Interrogatories.

13. On March 18, 2020, following the nationwide shutdown due to the coronavirus, counsel for the Defendants notified Plaintiff's counsel that due to COVID-19, she was working remotely, and requested that a courtesy copy of all mailed/personally served documents to emailed to her office email address.

14. Upon information and belief, there was no correspondence or communication between the parties until a June 16, 2020 email from Plaintiff's counsel.

15. Based on Plaintiff's February 26, 2020 interrogatories, in or about late July 2020, Defendants requested from the NYPD a collection from the email boxes of plaintiff, Diane Pizzuti, James O'Neill, Benjamin Tucker, and Terrence Monahan.

16. In August, and again in September, Defendants requested a meet and confer with Plaintiff concerning search protocols; specifically, Defendants invited Plaintiff to propose any additional custodians they wanted for the electronically-stored information ("ESI") collection from NYPD, and additionally, requested that Plaintiff propose search terms she wished to apply to the search.

17. Despite this offer, Plaintiff declined to participate or engage in any ESI protocol negotiations.

18. After receiving no suggestions from Plaintiff, Defendants collected the email boxes of Plaintiff, Diane Pizzuti, Terrence Monahan, and the two individually-named defendants, James O'Neill and Benjamin Tucker using the search terms "Pizzuti OR Jaffe OR Joanne OR Diana OR 873158 OR 878402," for the time period between January 1, 2015 and June 30, 2018.[1]

19. Due to the size of the collection, the document population was initially reviewed using continuous active learning. Continuous Active Learning or "CAL" is a software program that continuously learns and refines a model of responsiveness as the reviewer codes documents in the review population. Unlike in a standard active learning workflow, the reviewer does not create a seed set of documents, nor is a control set created. Rather, as the model

---

[1] Numbers "873158" and "878402" are the Tax Identification Numbers used by the NYPD for Joanne Jaffe and Diana Pizzuti, respectively.

updates, it continuously ranks and re-ranks all documents in the review population based on the likelihood that each is responsive. As it does so, the software continuously reorders the review queue to bring the most likely responsive documents to the front. The reviewer ends up seeing an increasing number of responsive documents until they are seeing nearly all responsive documents. Eventually, after the most likely responsive candidates have been reviewed, the reviewer sees an increasing number of non-responsive documents.

20. After completing the CAL review, from late October to early December, Defendants engaged in a QC, validation, and linear review of the remaining document population.

21. On or about October 20, 2020, Plaintiff made her first document production, in the form of a drop box link, which contained approximately 51,995 documents. None of these documents were Bates stamped, organized in any fashion, nor identified as responsive to a proposed ESI search or Defendants' document requests. Plaintiff eventually acknowledged this production was a "data dump" and pulled the documents from the drop box link.

22. On December 10, 2020, the parties participated in a telephone conference with the Court. *See* ECF Docket Sheet. During the conference, the Court addressed the status of discovery, directing Defendants to produce any outstanding ESI, as well as any "notes" taken by Chief Raymond Spinella, former Chief of Staff for defendant O'Neill, or an affidavit stating that there are no "notes." The Court also directed the parties to enter into a Protective Order. Upon information and belief, the conference was not recorded or transcribed.

23. Following the December 10, 2020 conference with the Court, the parties participated in a meet and confer regarding additional discovery as requested by Defendants and directed by the Court.

24. On December 17, 2020, the Court so-ordered the parties' proposed Stipulation and Protective Order.  *See* ECF No. 41.

25. On December 23, 2020, Defendants produced approximately 1,049 pages of relevant documents pursuant to the ESI search.

26. On January 18, 2021, Plaintiff requested an ESI search, and provided Defendants with a list of individuals with the @CityHall.nyc.gov email address, which included the First Lady of New York City, Chirlane McCray and her staff, and 30 other individuals employed by the NYPD, along with other NYC agencies, between September 1, 2017 and February 1, 2018.

27. Plaintiff's January 18, 2021 proposed ESI search did not include a search of the Mayor's emails.

28. By email on January 25, 2021 to Plaintiff, Defendants agreed to the ESI collection proposed by Plaintiff on January 18, 2021.

29. On January 21, 2021, Defendants produced Chief Spinella's notes regarding NYPD Executive Level changes, bearing Bates stamp numbers D000029-D000033.

30. On January 25, 2021, in response to the Chief Spinella production, Plaintiff communicated by letter to indicate they were dissatisfied with the production, and requested to review and inspect all notes taken by Chief Spinella from the time period of July 1, 2017 to February 1, 2018.

31. On February 5, 2021, I communicated to Plaintiff that she was not entitled to unfettered access and review of Chief Spinella's notebooks, which contained potentially privileged and non-relevant material.

32. On February 8, 2021, I along with an attorney from NYPD Legal, personally reviewed two notebooks maintained by Chief Spinella from October 2017 and February 2018 to verify Chief Spinella's production.  Upon review, none of the notes had been altered or otherwise modified.  We also determined that 30 additional pages of notes were potentially relevant to the litigation, e.g., notes reflecting Chief Spinella's meetings with the four three-star chief who were asked to retire, meetings with other NYPD high-level executive staff, including at least three Deputy Commissioners, and notes outlining the planned reorganization.  These notes were copied, Bates stamped, and produced to Plaintiff with the assurance that counsel had personally reviewed Chief Spinella's notebooks and all responsive information from the notebooks had been produced.  I also communicated to Plaintiff that to the extent there were redactions, the redacted material was non-responsive.  *See* ECF No. 48.

33. On February 11, 2021, Chief Spinelli sat for deposition.  *See* Deposition of Raymond Spinella, dated February 11, 2021, annexed as Exhibit "A."  During his deposition, Chief Spinella testified that he took notes in two bound notebooks:  one general notebook, and one related to work performed by Price Waterhouse beginning in 2017.  *Id*. at 14:11-17:14; 26:11-13; 51-7-17.  Chief Spinella also testified that kept his notebooks in a cabinet in his office, and that no one other than he had access to the notebooks.  *Id*. at 20:10-21:3.  Finally, Chief Spinella testified that no one had altered or modified the notebook entries.  *Id*. at 34:8-36:16.

34. During his deposition, the parties agreed that Chief Spinella could refer to his full notebooks while questioned by Plaintiff's counsel.  *Id*. at 54:6-55:22.  Plaintiff's counsel questioned Chief Spinella on his notebook entries, including which books the produced pages came from, and the reasons why certain information was written in the Price Waterhouse book instead of his general notebook.  *Id*. at 74:17-81:9.

35. On February 23, 2021, the parties participated in the telephone conference with the Court. Upon information and belief, the conference was not recorded or transcribed. *See* ECF Docket Sheet.

36. During the Court conference, the Court directed Defendants to produce all the pages of the two notebooks Chief Spinella used to take notes, redacting all portions that were non-responsive. The Court also directed Defendants to broaden the initial search conducted by Defendants, to include the other two three-star chiefs that were asked to retire: former Chief of Transit, Joseph Fox and former Chief of Operations, Thomas Purtell.

37. On February 24, 2021, I communicated with the Law Department's E-Discovery Group and requested that Defendants' December 23, 2020 production be expanded to to include former Chiefs Fox and Purtell. I also requested that the ESI search include the names of Chief Spinella, as well as Tonya Meisenholder, the former Chief of Staff to defendant Benjamin Tucker.

38. In response to a request made by Plaintiff, in or about early March 2021 I communicated to the Law Department's E-Discovery Group that the @CityHall.nyc.gov email address, which included the First Lady of New York City ("FLONYC"), Chirlane McCray and her staff, and 30 other individuals employed by the NYPD, along with other NYC agencies, between September 1, 2017 and February 1, 2018, needed to be supplemented to include First Deputy Mayor Dean Fuleihan. Plaintiff did not request a search of Mayor Bill de Blasio's emails.

39. On March 3, 2021, I served Plaintiff with the results of her January 18, 2021 request seeking all communications between the First Lady of New York City, Chirlane McCray and her staff, and 30 other individuals employed by the NYPD, along with other NYC agencies,

between September 1, 2017 and February 1, 2018. This was Defendants' second ESI collection produced to Plaintiff.

40. On April 8, 2021, I served Plaintiff with a third ESI production, which supplemented Defendants' March 3, 2021 production that included the emails of First Deputy Mayor Fuleihan in the FLONYC search as requested.

41. On April 8, 2021, I also served Plaintiff with the complete notebooks of Chief Spinella's notebook entries, from November 14, 2017 to July 3, 2018, with redactions of non-responsive material, bearing Bates stamp numbers D000448-D000638; as well as Chief Spinella's Price Waterhouse Cooper ("PWC") notebook entries, with redactions of non-responsive material, bearing Bates stamp numbers D000639-D000677. *See* "Joanne Jaffe 4.8.2021 Production," annexed as Exhibit "B."

42. On April 13, 2021, Chief Spinelli again sat for deposition. *See* Deposition of Raymond Spinella, dated April 13, 2021, annexed hereto as Exhibit "C." Plaintiff's counsels were again afforded the opportunity to question Chief Spinella while he referred to his original copies of the general and Price Waterhouse notebooks. *Id*., generally.

43. On June 4, 2021, I served Plaintiff with a fourth ESI production, which supplemented Defendants' December 2020 production by including the email boxes of former Chief of Staff, Raymond Spinella, and former Chief of Staff, Tanya Meisenholder.

**III.    Witness Testimony**

    a.    **John Linder**

44. On March 2, 2021, I received a telephone call from John Linder, who explained that he had been contacted by Plaintiff's counsel, John Moscow, requesting that he speak with him.

45. During the conversation, Mr. Linder explained that he previously worked for former NYPD Commissioner, James O'Neill, and that he had provided advice and guidance to the Police Commissioner regarding the 2018 reorganization in which Plaintiff was asked to retire.  Prior to his call, I had no knowledge of John Linder.

46. Mr. Linder requested my opinion as to whether he should speak with Mr. Moscow.  I responded that I preferred that he defer the interview until I had time to determine whether his role with the City of New York as per his consultancy contract placed him in a position of privilege.

47. Immediately following our conversation, I reached out to NYPD Legal seeking information to determine the nature of the relationship between John Linder, the NYPD and the City of New York.

48. Mr. Linder thereafter sent an email to his attorney, Scott Turner, memorializing our conversation.  *See* March 2, 2021 from John Linder to Scott Turner, annexed as Exhibit "D".

49. Unable to get an immediate response from the NYPD as to the nature of the consultancy contract, out of an abundance of caution, I contacted Mr. Moscow to inform him that I had received a telephone call from John Linder, who I believed may have had a privileged relationship with the City of New York.  I expressed to Mr. Moscow that I believed it was unethical for Mr. Moscow to contact him directly.

50. On March 5, 2021, after consulting with the NYPD on the nature of the consultancy contract, and after consulting with the Law Department's Ethics Officer, I contacted Mr. Moscow and apologized for accusing him of unethical conduct.

51. On or about March 10, 2021, Plaintiff subpoenaed/noticed Mr. Linder's deposition and requested the production of documents.

52. On March 30, 2021, with his attorney, Scott Turner, present, Mr. Linder provided sworn testimony.  At his deposition, Mr. Linder testified that Plaintiff's counsel, John Moscow, had called his home to speak with him, but that he spoke with his wife and left a message to call.  *See* Deposition of John Linder, date March 30, 2021, annexed hereto as Exhibit "E," at 28:25-8.  After learning of the call, Mr. Linder testified that he called his attorney, Scott Turner.  *Id*. at 29:9-11.  Mr. Linder also testified that sometime thereafter, he called me on the recommendation of Jeff Schlanger, a lawyer friend who knew Mr. Moscow.  According to Mr. Linder, Mr. Schlanger provided my name and number and suggested that Mr. Linder speak with me.  *Id*. at 31:20-32:13.  When asked at his deposition why he did not return Mr. Moscow's calls, Mr. Linder testified that "[a]ny time . . . I'm being contacted by a lawyer I never met, I generally don't return those calls."  *Id*. at 31:15-19.

    b. **Simcha Eichenstein**

53. On April 20, 2021, I received a copy of a subpoena served on Simcha Eichenstein for testimony on April 26, 2021.

54. Later that same day, April 20, 2021, I received notification from my Division Chief, Eric Eichenholtz, and Karen Griffin, the Law Department's Chief Ethics Officer, confirming that a request from Simcha Eichenstein for legal representation had been referred from his former employing agency, the Mayor's Office, and that the Law Department had approved limited scope representation.

55. That evening, I received an email from Simcha Eichenstein who requested that I speak with him on the phone.

56. The following day, April 21, 2021, I spoke to Mr. Eichenstein. Following our conversation, I forwarded him a limited scope representation letter, which he executed and returned that same day.

57. On April 21 and April 22, 2021, I communicated by email with Plaintiff's counsel, in which I indicated that the Law Department would be providing limited scope representation of Simcha Eichenstein for purposes of his deposition only. I also informed Plaintiff's counsel that Simcha Eichenstein was not available on the date of the subpoena, and requested that counsel provide additional dates. *See* Email, dated April 21, 2021, from Donna Canfield to John Moscow, Louis La Pietra, and Diane Camacho, annexed hereto as Exhibit "F;" *see also* ECF No. 64-4.

58. On May 11, 2021, Simcha Eichenstein gave deposition testimony. Following his testimony, Plaintiff requested the retainer agreement between Mr. Eichenstein, as well as, "all emails sent to Simcha Eichenstein on January 6, 7, and 8 of 2018, so we seek the source of the words issued under [his] name which he does not believe he authored. We are, as you know, seeking to locate the source of such phrases as 'color is critical.'" *See* May 11, 2021 Letter from John Moscow to Donna Canfield, annexed as Exhibit "G."

59. By email, dated May 12, 2021, Defendants responded to Plaintiff's letter, taking the position that the retainer agreement was not relevant to the action, and that they would not engage in a fishing expedition of Mr. Eichenstein's emails, since there was no testimony that he had actually received the information by email, rather than in person. *See* May 12, 2021 Email from Donna Canfield to John Moscow, annexed as Exhibit "H."

60. On May 18, 2021, the parties submitted a joint letter to the Court. In it, the parties informed the Court that they may need an extension of discovery to conduct depositions,

that Plaintiff was seeking additional documents as part of her discovery prior to scheduling the depositions of former NYPD Commissioner James O'Neill and former First Deputy Commissioner Benjamin Tucker, that Plaintiff was seeking to depose the Mayor, Bill de Blasio and his wife, Chirlane McCray, and that Defendants would seek a protective order to preclude their depositions.  Plaintiff also indicated that she would be "seeking an order barring the Office of the Corporation Counsel from representing non-party witnesses who are former City employees."  *See* ECF No. 53.

61. On May 26, 2021, Plaintiff wrote to the Court to request that the Court address Plaintiff's request that (1) Defendants produce all emails sent to Mr. Eichenstein between January 6-8, 2018 so that she could determine the source of the words "POCs in position of leadership crucial;" and (2) Defendants produce a copy of the retainer agreement between Mr. Eichenstein and the Office of Corporation Counsel.  *See* ECF No. 58.

62. On June 3, 2021, the parties appeared for a telephone conference on the proposed motions.  Upon information and belief, the conference was not recorded or transcribed.  *See* ECF Docket Sheet.

63. During the conference, the parties discussed Plaintiff's proposed motion seeking an order barring the Office of the Corporation Counsel from representing non-party witnesses who are former City employees.  Following discussion on this topic, the Court granted Plaintiff's request to proceed with the motion, and directed Defendants to produce a copy of the retainer agreement between Mr. Eichenstein and the Office of the Corporation Counsel.

64. During the conference, the parties also addressed Plaintiff's request for all emails received by Mr. Eichenstein between January 6-8, 2021.  With respect to Plaintiff's request for any search or production of additional ESI, Defendants explained to the Court that

they had conducted at least three ESI searches, and requested that Plaintiff propose a final ESI search for all the documents she believed to be outstanding. In response, the Court directed the parties to meet and confer on any additional discovery and to revise the Case Management Plan. The Court did not direct Defendants to turn over all emails received and sent by Mr. Eichenstein from January 6 to 8, 2018, nor did it direct Defendants to conduct a search of Mr. Eichenstein's emails.

65. On June 14, 2021, I sent a copy of the retainer agreement to Plaintiff's counsel.

66. On July 1, 2021, the parties submitted a proposed Case Management Plan.

67. On July 6, 2021, after weeks of unsuccessful negotiations with Plaintiff concerning the scope of a final ESI collection, I notified Plaintiff that (1) Defendants would agree to collect from the email box of Simcha Eichenstein for the period of January 6-8, 2018 and produce the source of the email in question; and (2) Defendants would agree to collect from the email boxes of Mayor Bill de Blasio, First Deputy Mayor Dean Fuleihan, former First Deputy Mayor Anthony Shorris, Dominic Williams, and Emma Wolfe for the time period of 1/1/2017 and 4/30/2018. I informed Plaintiff that I would follow up with proposed search terms, and that "Defendants anticipate[d] that this will be the final ESI search in this matter." *See* Email, dated July 6, 2021, from Donna Canfield to John Moscow, annexed as Exhibit "I."

68. On July 7, 2021, I sent a list of proposed search terms to Plaintiff and requested that "if you have any modifications to the proposed search" to advise by Friday, July 9, 2021. *See* Email, dated July 7, 2021, from Donna Canfield to John Moscow, annexed as Exhibit "J."

69. On or about July 16, 2021, after not receiving any substantive response from Plaintiff's counsels concerning the search parameters, other than "we don't know," Defendants directed that the collection be made.

70. In early August, I began a review of approximately 2,029 emails received by Mr. Eichenstein between January 6-8, 2018.

71. On August 20, 2021, after conducting the review, I produced an email which identified the source of the phrase "People of color in senior leadership is crucial," as requested by Plaintiff.  *See* Exhibit "11," annexed to the Declaration of John W. Moscow.

72. On September 8, 2021, Defendants produced approximately 100 additional emails from Mr. Eichenstein's account that pertain to the political messaging surrounding the senior leadership appointments.  See "Jaffe – Eichenstein Email" Production," annexed as Exhibit "K."

73. I am currently completing a CAL review of the email collection for Mayor, Bill de Blasio, First Deputy Mayor Dean Fuleihan, former First Deputy Mayor Anthony Shorris, Dominic Williams, and Emma Wolfe for the time period of 1/1/2017 and 4/30/2018.  This collection yielded around 31,000 documents.  Defendants anticipate a production within thirty days.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated:    New York, New York
          September 13, 2021

                                    GEORGIA M. PESTANA
                                    Corporation Counsel of the City of New York
                                        Attorney for Defendants
                                    100 Church Street, Room 2-124
                                    New York, New York 10007
                                    (212) 356-2461

                            By:     ECF            /s/
                                    Donna A. Canfield
                                    Assistant Corporation Counsel
                                    dcanfiel@law.nyc.gov