UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOANNE JAFFE,

                         Plaintiff,

     against

CITY OF NEW YORK,
MAYOR BILL DE BLASIO, and POLICE
COMMISSIONER JAMES O'NEILL,

                     Defendants.

---

Docket No. 19-cv-07024  (LAP)

SECOND AMENDED COMPLAINT

JURY TRIAL DEMANDED

Plaintiff, JOANNE JAFFE, as and for her complaint, by her undersigned counsel alleges as follows:

INTRODUCTION

1.       After 38 years of dedicated service, Joanne Jaffe ("Chief Jaffe" or "Plaintiff"), without notice, was abruptly fired from the New York City Police Department ("NYPD") so that the Mayor of the City of New York could hold a press conference announcing that he was promoting people of color to senior executive ranks in the NYPD. Chief Jaffe, a White Jewish woman who did not fit the Mayor's political and promotional needs, was unlawfully fired to make room for someone who did.

2.       This is an action to vindicate Plaintiff and to remedy violations of her rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983; the New York State Executive Law § 296; and the New York City Administrative Code §§ 8-107 and 8-502.

1

3.      Chief Jaffe is seeking both compensatory and punitive damages. Punitive damages are particularly appropriate here where the behavior of the Defendants demonstrated a conscious disregard of Ms. Jaffe's rights. Defendants' wrongful acts alleged herein were not only premeditated and knowingly unlawful, but Defendants expressly acknowledged—and callously dismissed—the pain that their actions would cause to Chief Jaffe and others. Indeed, the City of New York vigorously asserted that such behavior is deserving of punitive damages in an *amicus curiae* brief it filed in the New York State Court of Appeals in September 2017, ironically, just months before the Mayor and others put their plan against Chief Jaffe into effect.[1]

## JURISDICTION AND VENUE

4.      The jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343 and 1367. The Court's pendent jurisdiction is also invoked pursuant to statutory reference.

5.      Jurisdiction exists by virtue of federal questions (*see* 28 U.S.C. § 1331) which arises under 29 U.S.C. § 621 *et seq.*; 42 U.S.C. § 2000e *et seq*; and 42 U.S.C. § 1983

6.      Venue is placed in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because, *inter alia*, Defendants committed their unlawful employment practices in the State of New York, and Chief Jaffe would have continued to work within this judicial district but for Defendants' unlawful employment practices.

## PROCEDURAL REQUIREMENT

7.      Plaintiff has exhausted all available and administrative remedies. Plaintiff filed a timely charge of age, sex and racial discrimination with the Equal Employment Opportunity

---

[1] Brief for City of New York as Amicus Curiae Supporting Appellant, *Chauca v. Abraham*, 30 N.Y.3d 325 (2017) (No. 113), 2017 WL 5891981.  The brief, filed by the City while Bill de Blasio was running for re-election as Mayor, urged the propriety of punitive damages where "a discriminator has acted maliciously, exhibited a conscious or reckless disregard or gross negligence towards the rights of others, or caused injury or harm to another willfully, wantonly, or recklessly based on that person's protected status." See the brief at page 3.

Commission and received a notice dated April 29, 2019, of her right to sue in the United States District Court pursuant to 42 U.S.C. § 2000e-5 permitting plaintiff to bring this action. Plaintiff, therefore, satisfied all procedural requirements prior to commencing this action.

PARTIES

8.     Defendant City of New York is a municipal corporation established by law. Its conduct is regulated by the City Charter and by the Administrative Code, as well as applicable federal and state laws, which forbid discrimination on the basis of race, age, national origin and sex. City law specifically provides for punitive damages, as well as compensatory damages, for violation of those laws.

9.      Defendant Bill de Blasio (hereinafter "de Blasio" or "the Mayor") was the Mayor of the City of New York from January 1, 2014 through December 31, 2021. As Mayor he was legally obligated to enforce and abide by the Federal, State, and City laws forbidding discrimination on the bases of age, gender, race, and national origin.[2] De Blasio, however, was politically ambitious. While Mayor he ran for President of the United States. Thereafter, he made it clear that he wanted to be a candidate for Governor of the State of New York in 2022, or a candidate for Congress.  DeBlasio, working with Defendant James O'Neill and others, personally engaged in, aided, and abetted violations of those laws as described below. Accordingly, this action names de Blasio as a Defendant in his *personal capacity*.

10.    Defendant Police Commissioner James O'Neill (hereinafter "O'Neill"), at all times relevant herein, was employed by the City of New York, most recently as the Commissioner of

---

[2] The New York City Charter provides, in Chapter 1, Section 8: "General powers/ The mayor, subject to this charter, shall exercise all the powers vested in the city except as otherwise provided by law." Subdivision (a) states that "[t]he mayor shall be responsible for the effectiveness and integrity of city government operations and shall establish and maintain such policies and procedures as are necessary and appropriate to accomplish this responsibility including the implementation of effective systems of internal control by each agency and unit under the jurisdiction of the mayor." Section (b) states: "The mayor shall be a magistrate."

the New York City Police Department (hereinafter "NYPD"), to which job he was appointed by de Blasio in 2016. O'Neill, as Chief Jaffe's superior at NYPD after 2016, had the power to make personnel decisions regarding her employment—but not in contravention of any of the Federal, State or City civil rights laws. O'Neill, however, working with de Blasio and others, personally engaged in, aided and abetted the unlawful conduct described below. This action names O'Neill as a Defendant in his *personal capacity*.

11.     Chief Jaffe, the Plaintiff, who resides in Forest Hills, New York, was employed by Defendant City of New York through its agency, the NYPD, from 1979 to on or about January 8, 2018, at which time Defendants forced Chief Jaffe to vacate her position and to retire. Ms. Jaffe is a White Jewish-American woman who was just short of 60 years of age when fired.

12.     At all times relevant herein, Chief Jaffe was an "employee" of Defendants within the meaning of Title VII of the Civil Rights Act of 1965, protected against discrimination on the basis of her race (White), national origin (non-Hispanic), and sex/gender (female), pursuant to 42 U.S.C. § 2000e *et seq*. and the other statutes cited above.

13.     At all times relevant herein, Chief Jaffe was protected against discrimination on the basis of age and was a member of the protected group of workers 40 years of age or older pursuant to the Age Discrimination and Employment Act, 29 U.S.C. § 621 *et seq.*, and the other statutes cited above.

14.     At all times relevant herein, Defendant City of New York was Chief Jaffe's "employer" within the meaning of 42 U.S.C. § 2000e *et seq.* and the other statutes cited above.

<u>FACTS</u>

i.   <u>Background</u>

15.     The NYPD is a huge hierarchical organization. It has 55,000 employees, but, during the relevant time period, it had only thirteen three-star chiefs and one four-star chief. All ranks of captain and below are awarded based on civil service exams. The police commissioner selects from among the captains, individuals to fill the roles of deputy inspectors, inspectors, deputy chiefs, assistant chiefs, and chiefs. A vacancy at the chief level creates many opportunities for promotion and transfer.

16.     Chief Jaffe joined the NYPD in 1979 as a police officer and was continuously employed by the NYPD until her termination on or about January 8, 2018, when she held the rank and position of Chief of Community Affairs.

17.     Ms. Jaffe's thirty-eight years of experience and rise through the ranks included, but were not limited to, her being a Precinct Commander of three different precincts: the 1st, 33rd, and 19th; Patrol Borough Commander; Commanding Officer of the Office of Management, Analysis and Planning; and Chief of two bureaus: Chief of Housing and Chief of Community Affairs.

18.     Prior to becoming Chief of Community Affairs on February 28, 2014, Plaintiff rose through the ranks of sergeant, lieutenant, captain, deputy inspector, inspector, assistant chief—where she was Patrol Borough Commander for the Bronx—and chief.

19.     A patrol borough commander is responsible for commanding every precinct within a patrol borough; it is a borough wide position. As Patrol Borough Commander for the Bronx, Plaintiff commanded the 40th, 41st, 42nd, 43rd, 44th, 45th, 46th, 47th, 48th, 49th, 50th, and 52nd precincts, as well as specialized units like the Bronx Task Force.

20.     In 2003, Plaintiff was promoted to Chief of Housing, being the first woman to rise to the level of three-star bureau chief in the 174-year history of the NYPD.

21.     NYPD Chief of Housing is a city-wide position, and as such, Plaintiff was responsible for the overall safety of over 400,000 residents, employees, and visitors in New York City's housing developments throughout the City of New York.

22.     As of January 2018, there were thirteen three-star chiefs. The only uniformed rank higher than three stars is the four-star chief of department, of which there is only one.

23.     Moreover, Chief Jaffe was not merely the senior woman among the chiefs in the NYPD; she was the senior three-star Chief in the Department at the time of her termination in 2018.

24.     Chief Jaffe was well respected within the NYPD as well as outside of it. She was active in the law enforcement community in advancing the role of women. She worked with James O'Neill for many years, including fifteen months while he was police commissioner, during which time he increasingly included her in high level, critical policy matters beyond her official command responsibilities, e.g., when he asked her to examine and report on how the NYPD dealt with emotionally disturbed persons following a fatal shooting by a member of the NYPD.

25.     Chief Jaffe was fully dedicated to the NYPD. Her commitment was such that she anticipated retiring no sooner than when she reached the NYPD's mandatory retirement age.   On January 8, 2018, Chief Jaffe had not yet reached that age.

ii.   Events Leading Up to Chief Jaffe's termination

26.     On or around August 14, 2017, then Chief of Department Carlos Gomez told O'Neill, then the Police Commissioner, that he would be retiring at the end of the year. Their conversation took place at the Barclays Center, during a NYPD sponsored event.

27.     Gomez was the only four-star chief in the NYPD, and by far the most senior Hispanic employee in the upper ranks of the NYPD hierarchy. His departure, which he scheduled for the middle of December 2017, would noticeably diminish the diversity of the NYPD's senior leadership. The departure of Gomez also initiated a power play to fill his vacancy, and the vacancy to result from the prospective promotion of his successor. The Chief of Department job is traditionally filled by the promotion of another senior member of the NYPD, whose promotion creates another vacancy to be filled, and so on, down a chain of promotions.

28.     At that time, O'Neill wanted Terry Monahan, then the Chief of Patrol, to replace Gomez.

29.     It is customary for the Police Commissioner to designate his Chief of Department. Mayor de Blasio and his wife, however, had their own ideas.

30.     On information and belief, the Mayor's wife, Chirlane McCray, who used the acronym "FLONYC"[3] for First Lady of New York City, wanted Rodney Harrison, a Black man, to replace Gomez.

31.     Mayor de Blasio and senior members of his administration had the idea that the NYPD, in particular the executive ranks, should have its staffing reconfigured along racial lines, so as to make the NYPD "demographically"[4] representative of the current population of the City. In addition, the Mayor felt that it would serve his personal political fortunes to promote people of Hispanic heritage to high ranks in the NYPD on the basis of their race and/or ethnicity. The Mayor, O'Neill, and others decided to speed the promotion of Black people and people of Hispanic/Latin

---

[3] That acronym is found on email chains discussing NYPD business—in which McCray appears to have been involved.

[4] The demographic referred to appears to be racial—White, Black, Hispanic, and Asian, in that order.

American ancestry, to change the "demographics" of the executive staff and protect the Mayor's reputation.

32.     To make room for the promotion of "people of color," vacancies had to be created either by creating new jobs or firing the people currently filling those spots. Mayor de Blasio, Police Commissioner O'Neill, and their allies chose the latter course and determined to fire four older White chiefs, all over the age of 57, rather than create new job slots. They did so without regard to the rights of the senior police officers who were to be summarily fired because of their race and age to make room for their replacements, direct and indirect.

33.     Defendants decided to fire these four White chiefs so that the Mayor could claim credit (as he later did) for promoting "people of color," Hispanic officers, and women. Of course, when the Mayor paraded in the press his efforts to promote women, he only highlighted women whom he promoted, not the ones he fired—two of whom, one being Plaintiff, were *the only two women ever before to receive three stars in the NYPD.*

34.     The Mayor made no secret of the reasons behind his insistence that Chief Jaffe and the three other chiefs be removed from their positions, and no secret of his callous indifference to the removals' consequences. On December 16, 2017, de Blasio exchanged a slew of emails with O'Neill in which he impressed upon O'Neill the urgency of the terminations to avoid the "*situation*" caused by Gomez's departure,[5] which he believed would "*only exacerbate the demographic tensions*" in the city, i.e., the political pressure from Hispanic community leadership. The Mayor regarded the damage he and O'Neill were plotting to cause Chief Jaffe and the others by the proposed unlawful conduct as "*the human reality for a few individuals.*"

---

[5] I.e., leaving the NYPD without senior Hispanic leadership.

35.    De Blasio, O'Neill, and others had made the decision to fire Chief Jaffe and her colleagues by mid-December 2017 but, to avoid muddying the news impact of de Blasio's announcement regarding his promotions of people of color, the impending firings were kept secret. While O'Neill planned to, and ultimately did, carry out the terminations after the holidays in early January 2018, Mayor de Blasio requested in his December 16, 2017, correspondence with O'Neill that the terminations take place sooner so as to "*bury the departures in the pre-holiday media lull*." In other words, de Blasio hoped to avoid scrutiny of their unlawful plan to compel the simultaneous 'resignation' of four three-star chiefs, which would have generated significant media attention and discomfort (or as O'Neill called it, "*a major distraction*") within the NYPD.

   iii.   <u>Defendants' Unlawful Termination of Ms. Jaffe</u>

36.    On January 8, 2018, Chief Jaffe was called in to O'Neill's office to meet with O'Neill and Tucker; whereupon in a meeting lasting a minute or so, O'Neill ordered her to file for retirement and to be out of her office by Friday, January 12, 2018, as though she had engaged in misconduct. However, during that meeting, O'Neill made no allegations of misconduct or any terminable offense by Chief Jaffe. Chief Jaffe had never expressed an intention to retire, nor did she have any such interest. To the contrary, she intended to continue her work with the NYPD until she was reached the mandatory age of retirement. Chief Jaffe was, unmistakably, fired.

37.    O'Neill presented Plaintiff with no alternatives to continue her employment, and Plaintiff could not have reasonably or tolerably continued her employment in light of the Mayor's and O'Neill's order that she quit, as they had determined that Chief Jaffe should be replaced with a younger person of color.

38.    First Deputy Police Commissioner Benjamin Tucker (hereinafter "Tucker"), was the First Deputy Police Commissioner of the NYPD at the time of Chief Jaffe's termination.

Tucker, who started with the NYPD in 1969, was nominally the second in command of the NYPD and personally knew most of the senior staff. Despite his rank, his seniority, and his knowledge of the senior personnel, Tucker, a Black man, was not consulted by the Mayor or O'Neill about their planned unlawful termination of Chief Jaffe until the plan was being put into effect.

39.     Although Section 13-426 of the New York City Administrative Code states that a uniformed NYPD officer cannot retire on less than 30 days' notice, Chief Jaffe was instructed during the brief Monday meeting to file her retirement papers and clear out her desk by that Friday, January 12, 2018, with only four days' notice.

40.     Because Defendants removed Plaintiff from her position and workspace with less than a week's notice, in knowing violation of Section 13-426 of the New York City Administrative Code and NYPD norms, Defendants instructed Plaintiff to submit falsified time sheets as though she were working even though she would not be at work, which she refused to do.

<u>Defendants' Discriminatory Motives and Practices</u>

41.     Fired alongside Chief Jaffe were three other three-star chiefs—each older than 57 and each White. They were disposed of so that the Mayor, who had won re-election only days earlier on a campaign centered on racial inequality, could announce a series of high-ranking promotions of men and women of color.

42.     The pressure to create vacancies so that the Mayor could have his press conference was a dominant force. As Tucker explained to the other female three-star chief, Diane Pizzutti, who was also fired on January 8, 2018: "*We don't have a spot for you*." The unstated corollary was the NYPD was firing Pizzuti to create a vacancy for someone else to fill.

43.     At the time the four chiefs were fired, the crime rate was as low as it had been in decades. This was due, in part, to the service and community safety programs instituted by those

chiefs—including Chief Jaffe.[6] Following their firing, the decline in the crime rate slowed, stopped, and reversed.

44.     Both after and before he fired Chief Jaffe, O'Neill issued words praising her performance in the NYPD.

45.     Nevertheless, when O'Neill notified Chief Jaffe of her termination on January 8, 2018, he afforded her just four days to clean out her desk so that the Mayor's intended replacement for Ms. Jaffe as Chief of Community Affairs, Ms. "Irrizary" Hofmann, would have an office.

46.     In his focus on promoting Hispanic officers, de Blasio told O'Neill and First Deputy Commissioner Tucker that "*it's really important the press release say 'Nilda Irrizary Hoffman* [sic]*' to get the point across. Unless she has a strong personal objection to that, it is important for the team. And I'm happy to talk to her personally if needed*."

47.     Notably, Ms. "Irrizary'" Hofmann, at this point in her career, had only used the name "Hofmann" since her marriage in 1992. This was not sufficient for de Blasio because Hofmann's Hispanic heritage would not be readily apparent to the "validators," the press, and the public when he announced her promotion, so he insisted that the more Hispanic-sounding "Irrizary" be used.

48.     When the promotions were announced, numerous mayoral aides at City Hall telephoned so-called "validators" to put out the message that they had given important promotions to "people of color." The conversations reportedly degenerated into a discussion of, "How many

---

[6] *See* Success Academy, *How This Former Police Chief Keeps Our Scholars Safe*, MISSION POSSIBLE BLOG (Oct. 18, 2019), https://www.successacademies.org/education-blog/how-this-former-police-chief-keeps-our-scholars-safe/; *see also* MALCOLM GLADWELL, DAVID AND GOLIATH: UNDERDOGS, MISFITS, AND THE ART OF BATTLING GIANTS (2013) (a 2013 non-fiction account of, *inter alia*, Chief Jaffe's success in addressing juvenile crime in a Brooklyn neighborhood—summary available at https://www.litcharts.com/lit/david-and-goliath/characters/joanne-jaffe).

stars [i.e., promotions to Deputy Chief and higher] did the Latinos get?" without regards to the qualifications of those selected (or those removed to create new vacancies).

49.     Unlike Ms. Jaffe, the younger Hofmann had never held a city-wide position, or even a borough-wide position, prior to being promoted to the Chief of Community Affairs role. Hofmann was, however, the senior Hispanic woman on a chart called for by O'Neill when he and de Blasio were developing their discriminatory plan, which showed the race, age, and gender of NYPD women who were captains or above.

50.     As of the date of Plaintiff's unlawful termination on January 8, 2018, Hofmann's experience was limited to commanding two precincts, the 25th and 52nd—far more limited than Plaintiff's experience had been when she promoted to Chief.

51.     In firing Plaintiff, Defendants did not consider Plaintiff's own important contributions to equity and diversity in the NYPD. During her tenure and especially since 2014, as Chief of Community Affairs, she was outspoken about racism and sexism within the NYPD.

52.     In or around February of 2016, Plaintiff created a mentorship program for newly promoted female sergeants, to assist and help navigate the challenges and sexism faced by women transitioning to the rank of sergeant (first line supervisor) in the NYPD.

53.     During training sessions at Columbia University, the NYPD Executive Forum Series focused on leadership and communication regarding implicit bias. On December 2016, January 2017, February 2017, and thereafter in May 2017, Plaintiff publicly spoke out about racism and sexism that she had seen in the ranks of the NYPD.

54.     During a November 2017, executive meeting in the Police Commissioner's office, and in the presence of the Police Commissioner and other executives, Plaintiff opined, as she had before, about gender insensitivity throughout the NYPD, e.g., the default use of the word "he," as

in "he the Sergeant" or "he the Captain" in the context of all meetings, both internal and external, as well as in all facets of training. Plaintiff proposed during this meeting that the NYPD should adopt gender neutral language.

55.     Plaintiff opposed the NYPD's gender bias not just in words but in action. For example, following the October 31, 2017, terrorist truck attack in lower Manhattan, the only two women investigators whom Plaintiff saw at the incident command post at Stuyvesant High school were tasked with taking notes, rather than conducting interviews or seeking physical evidence. Plaintiff raised the issue to then NYPD Chief of Detectives, Robert Boyce. Similarly, in December 2017, following the terrorist bombing at the Port Authority Bus Station, Plaintiff saw and raised concerns that two uniformed female police officers were assigned to check people in, another administrative task, while the "men 'did the work.'"

56.     On January 8, 2018, within a month after the terrorist bombing of the Port Authority Bus Terminal, the Police Commissioner terminated Plaintiff and the only other female three-star Chief, Chief of Personnel Diana Pizzuti (the first woman to be named chief of personnel in the history of the NYPD) as well as Chief of Transit Joseph Fox, and Chief of Citywide Operations Thomas Purtell.

57.     Given Plaintiff's above-described track record as a trailblazer for women in the NYPD, an outspoken opponent of discrimination, and an effective job performer, her removal from the NYPD could not have been reasonably calculated to make the NYPD a more effective or equitable organization. Defendants' decision to terminate Plaintiff simply in order to replace her with a younger Hispanic woman was a cynical public relations move that put de Blasio's political interests ahead of the law and the wellbeing of dedicated NYPD civil servants.

iv.  Harm Caused by Defendants' Conduct

58.     As a result of Plaintiff's unlawful termination, she was denied a "walk-out" ceremony, an honor given to NYPD personnel in various ranks who retire.

59.     In past practice, the higher one's rank, the bigger the walk-out ceremony. Conversely, in Plaintiff's case, she was not "walked out," but rather "thrown out."

60.     The implication of this, to colleagues in the law enforcement community was that she was no longer a superstar of whom the department could be proud, but rather a former cop who had engaged in unspecified conduct such that the Department could not keep her around. Being fired in that way, with no ceremony and with unlawful haste as though she were being fired for cause, impaired her reputation and hurt her standing in the law enforcement community, among the people with whom she had spent more than 38 years of her life. The firing humiliated her personally, and caused her immense, uncalled-for mental anguish and suffering.

61.     Instead of entering the ranks of Department retirees as a well-respected "retiring" NYPD bureau chief, who would be honored whenever she appeared, she was joining their ranks as a "fired" NYPD bureau chief—fired for reasons that no one is willing to articulate.

62.     Plaintiff's service and contribution to the NYPD were acknowledged in a statement by Defendant O'Neill in a published NYPD press release dated that same day he fired her where he said: "*These men and women have devoted more than a century of service to the NYPD and to the people of this city ... Each of them has tirelessly contributed their very best efforts to help bring about the massive crime reduction of the last few decades. We thank them for this, knowing their great talents will continue to bring them much success.*"

63.     However, for people in the law enforcement community, to which Chief Jaffe had dedicated her professional life, O'Neill's action in throwing Chief Jaffe out of the department

14

spoke far more eloquently than the words that he chose to utter. The law enforcement community, which knows the adage "Actions speak Louder than Words," heard his words and saw his actions.

64.     The harm that O'Neill and the Mayor inflicted upon Chief Jaffe by firing her was compounded by the abrupt manner in which they did it, which created the appearance that Chief Jaffe was terminated (or resigned in lieu of termination) for cause, when in fact her only "fault" was being an older White female. O'Neill's statement of praise is wholly inconsistent with the way in which he treated Ms. Jaffe and the other terminated chiefs, with whom he had worked for years, including 15 months as Police Commissioner.

65.     But for Plaintiff's unlawful termination, she would have worked for the NYPD until the eve of her 63rd birthday. She could have planned for her next job and retired with the esteem and respect of her colleagues in the NYPD and outside.

66.     By engaging in the foregoing conduct Defendants changed the terms and conditions of Plaintiff's employment based on her race, age, national origin, and sex/gender, in violation of law.

67.     Ironically, after Gomez had told the Police Commissioner and Mayor that he would be retiring, the New York City Law Department filed a brief, as a friend of the Court, in a civil case in which the New York Court of Appeals was to determine the scope of the punitive damages clause contained in the City Human Rights Law (HRL). The City wrote in its September 2017 brief that the "*HRL makes clear that discrimination will not be tolerated in the City of New York*" and urged the Court to find that the law is to "*be construed liberally to accomplish its purposes, both in its interpretation and in its application*."[7] The Court of Appeals of New York agreed on

---

[7] *See supra* paragraph 3 and note 1.

November 20, 2017, at the same time that the Defendants were planning to fire senior White NYPD Chiefs to create vacancies for people of color.[8]

68.     The Court of Appeals' decision, with the full support of the City and the Mayor, set the standard that governs Chief Jaffe's claims under the HRL.  Punitive damages should be broadly available for claims under the HRL more frequently than they are in the negligence context.

69.     The HRL provides for both compensatory damages and punitive damages. De Blasio and O'Neill are each personally liable for both types of damages.

70.     Plaintiff is not seeking punitive damages against the City—just the individuals. Plaintiff also seeks compensatory damages from the City and other forms of relief to which she is entitled under the law.

71.     By engaging in the foregoing conduct, Defendants violated Chief Jaffe's rights not only under the New York City HRL (New York City Administrative Code §§ 8-107), but under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and New York State Executive Law § 296.

72.     As a proximate result of Defendants' wrongful acts alleged herein, Plaintiff suffered, and continues to suffer, loss of employment, impairment to her reputation, diminishment of her standing in the law enforcement community, personal humiliation, mental anguish, pain and suffering, loss of enjoyment of life, loss of past and future economic opportunities, and other pecuniary and non-pecuniary losses. She has incurred substantial damages thereby.

---

[8] *Chauca v. Abraham*, 30 N.Y.3d 325 (2017).

73.     By acting as described above, Defendants acted with malice and with a conscious or reckless disregard for or gross negligence towards Plaintiff's rights, causing her to suffer emotional anguish, psychological harm, and past and future economic loss, and entitling her to damages for each cause of action. Plaintiff seeks compensatory damages, punitive damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

### AS AND FOR A FIRST CAUSE OF ACTION

### RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq*.

74.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

75.     Defendants' disparate and discriminatory treatment of Plaintiff on the basis of her race violated Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*.

76.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

77.     By reason of the foregoing, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

## AS AND FOR A SECOND CAUSE OF ACTION

### RACE DISCRIMINATION IN VIOLATION OF
### NEW YORK EXECUTIVE LAW § 296(1)(a).

78.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

79.     Defendants discriminated against Plaintiff on the basis of race in violation of New York Executive Law § 296(1)(a), also known as New York State Human Rights Law (hereinafter "NYSHRL").

80.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYSHRL, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

81.     By reason of the foregoing, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

## AS AND FOR A THIRD CAUSE OF ACTION

### RACE DISCRIMINATION IN VIOLATION OF
### THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107.

82.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

83.     Defendants' disparate and discriminatory treatment of Plaintiff on the basis of her race violated the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107.

84.     Plaintiff is a person aggrieved by an unlawful discriminatory practice as contemplated by N.Y.C. Admin. Code § 8-502.

85.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYCHRL, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

86.     By reason of the foregoing, and pursuant to N.Y.C. Admin. Code § 8-502, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

87.     Moreover, the discriminatory actions of individual Defendants de Blasio and O'Neill, as alleged herein, were taken with willful or wanton negligence, recklessness, and/or a conscious disregard of Ms. Jaffe's rights, or constituted conduct so reckless as to amount to such disregard, so as to entitle Plaintiff an award of punitive damages against Defendant de Blasio and an award of punitive damages against Defendant O'Neill.

## AS AND FOR A FOURTH CAUSE OF ACTION

### AGE DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA), 29 U.S.C. § 621 *et seq.*

88.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

89.     Defendants' disparate and discriminatory treatment of Plaintiff on the basis of her age violated the ADEA, as amended, 29 U.S.C. § 621 *et seq.*

90.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the ADEA, Plaintiff suffered, and continues to suffer, *inter alia*, harm to her career and economic loss, as alleged above.

91.     By reason of the foregoing, Plaintiff seeks lost earnings, liquidated damages, equitable relief, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

## AS AND FOR A FIFTH CAUSE OF ACTION

### AGE DISCRIMINATION IN VIOLATION OF
### THE NEW YORK STATE EXECUTIVE LAW § 296(1)(a).

92.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

93.     Defendants discriminated against Plaintiff on the basis of age in violation of NYSHRL.

94.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYSHRL, Plaintiff suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to award of compensatory damages and attorneys' fees.

95.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYSHRL, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

96.     By reason of the foregoing, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

## AS AND FOR A SIXTH CAUSE OF ACTION

### AGE DISCRIMINATION IN VIOLATION OF THE NEW YORK CITY
### ADMINISTRATIVE CODE § 8-107

97.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

98.     Defendants' disparate and discriminatory treatment of Plaintiff on the basis of her age violated the NYCHRL, N.Y.C. Admin. Code § 8-107.

99.     Plaintiff is a person aggrieved by an unlawful discriminatory practice as contemplated by N.Y.C. Admin. Code § 8-502.

100.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYCHRL, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

101.    By reason of the foregoing, and pursuant to N.Y.C. Admin. Code § 8-502, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

102.    Moreover, the discriminatory actions of individual Defendants de Blasio and O'Neill, as alleged herein, were taken with willful or wanton negligence, recklessness, and/or a conscious disregard of Ms. Jaffe's rights, or constituted conduct so reckless as to amount to such disregard, so as to entitle Plaintiff an award of punitive damages against Defendant de Blasio and an award of punitive damages against Defendant O'Neill.

## AS AND FOR A SEVENTH CAUSE OF ACTION

**NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq*.**

103.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as full set forth at length herein.

104.    Defendants' disparate and discriminatory treatment of Plaintiff based on her national origin violated Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*.

105.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

21

106.     By reason of the foregoing, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF NEW YORK STATE EXECUTIVE LAW § 296(1)(a).

107.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as full set forth at length herein.

108.     Defendants discriminated against Plaintiff on the basis of national origin in violation of the NYSHRL.

109.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYSHRL, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

110.     By reason of the foregoing, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

## AS AND FOR A NINTH CAUSE OF ACTION

### NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107.

111.     Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

112.     Defendants' disparate and discriminatory treatment of Plaintiff on the basis of her national origin violated the NYCHRL, N.Y.C. Admin. Code § 8-107.

113.     Plaintiff is a person aggrieved by an unlawful discriminatory practice as contemplated by N.Y.C. Admin. Code § 8-502.

114.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYCHRL, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

115.    By reason of the foregoing, and pursuant to N.Y.C. Admin. Code § 8-502, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

116.    Moreover, the discriminatory actions of individual Defendants de Blasio and O'Neill, as alleged herein, were taken with willful or wanton negligence, recklessness, and/or a conscious disregard of Ms. Jaffe's rights, or constituted conduct so reckless as to amount to such disregard, so as to entitle Plaintiff an award of punitive damages against Defendant de Blasio and an award of punitive damages against Defendant O'Neill.

**AS AND FOR A TENTH CAUSE OF ACTION**

**SEX DISCRIMINATION IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq*.**

117.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

118.    Defendants' disparate and discriminatory treatment of Plaintiff on the basis of her sex violated Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*.

119.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

23

120.    By reason of the foregoing, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

### GENDER DISCRIMINATION IN VIOLATION OF NEW YORK STATE EXECUTIVE LAW § 296(1)(a).

121.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

122.    Defendants discriminated against Plaintiff on the basis of gender in violation of the NYSHRL.

123.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYSHRL, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

124.    By reason of the foregoing, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

## AS AND FOR A TWELFTH CAUSE OF ACTION

### GENDER DISCRIMINATION IN VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107.

125.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as full set forth at length herein.

126.    Defendants' disparate and discriminatory treatment of Plaintiff on the basis of her gender violated the NYCHRL, N.Y.C. Admin. Code § 8-107.

127.    Plaintiff is a person aggrieved by an unlawful discriminatory practice as contemplated by N.Y.C. Admin. Code § 8-502.

128.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYCHRL, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

129.     By reason of the foregoing, and pursuant to N.Y.C. Admin. Code § 8-502, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

130.     Moreover, the discriminatory actions of individual Defendants de Blasio and O'Neill, as alleged herein, were taken with willful or wanton negligence, recklessness, and/or a conscious disregard of Ms. Jaffe's rights, or constituted conduct so reckless as to amount to such disregard, so as to entitle Plaintiff an award of punitive damages against Defendant de Blasio and an award of punitive damages against Defendant O'Neill.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION

### VIOLATIONS OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (MONELL CLAIM)

131.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

132.     Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, individuals have the right to be free from discrimination in public employment.

133.     As alleged herein, members of the NYPD harmed Plaintiff and violated Plaintiff's rights under the Fourteenth Amendment when they discriminated against her on the basis of her race, national origin, age, and sex/gender ("protected characteristics"), including when Plaintiff was removed from her position with the NYPD in order to create a vacancy for a less experienced officer whose protected characteristics were deemed preferable to Plaintiff's, and when the NYPD

recklessly and callously fired Plaintiff in a manner that needlessly harmed Plaintiff and Plaintiff's hard-earned personal and professional reputation.

134.    Defendant City of New York had a duty to adequately train, supervise, and discipline members of the NYPD, in order to protect members of the public, including Plaintiff, from unnecessary harm and violations of their civil and constitutional rights.

135.    Said Defendant was deliberately indifferent to such duties and thereby proximately caused injury to Plaintiff as complained of herein.

136.    As a direct and proximate result of Defendants' violations of Plaintiff's civil and constitutional rights, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

137.    By reason of the foregoing, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION

## DEPRIVATION OF RIGHTS UNDER 42 U.S.C. § 1983

138.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

139.    All of the aforementioned acts of Defendants and their agents, servants, and employees were being carried out under the color of state law.

140.    Defendants, collectively and individually, while acting under color of state law, subjected Plaintiff to intentional discrimination based on her protected characteristics, depriving her of her civil and constitutional rights. Defendants' conduct constituted a custom, usage, practice, procedure and/or rule of the NYPD and/or City of New York, was carried out with the

acquiescence of the municipality's senior policy-making officials, and was forbidden by the Constitution of the United States of America, including the Fourteenth Amendment.

141.    As a direct and proximate result of Defendants' violations of Plaintiff's civil and constitutional rights, Plaintiff suffered, and continues to suffer, emotional, psychological, and economic harms as alleged above.

142.    By reason of the foregoing, Plaintiff seeks compensatory damages, attorneys' fees, the costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

143.    Plaintiff repeats, reiterates and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as full set forth at length herein.

144.    In enacting the NYCHRL, the New York City Council declared that, "[i]n the city of New York…there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of" prejudice.[9] The Council further found and declared that, "prejudice, intolerance, bigotry, and discrimination, bias-related violence or harassment and disorder occasioned thereby threaten the rights and proper privileges of [New York's] inhabitants and menace the institutions and foundation of a free democratic state."[10]

145.    Consistent with City of New York's codified position regarding prejudice and discrimination, Defendants' discriminatory actions, as complained of herein, amount to extreme

---

[9] N.Y.C. Admin. Code § 8-101, *quoted in* Brief for City of New York as Amicus Curiae Supporting Appellant, *Chauca v. Abraham*, 30 N.Y.3d 325 (2017) (No. 113), 2017 WL 5891981.
[10] *Id.*

and outrageous conduct that went beyond all possible bounds of decency, and which is to be regarded as atrocious and utterly intolerable in a civilized community.

146.    Defendants carried out their extreme and outrageous conduct intentionally and with reckless disregard for a substantial probability of causing Plaintiff severe emotional distress.

147.    Defendants' extreme and outrageous conduct proximately caused, and continue to cause, Plaintiff to suffer severe emotional distress.

148.    Based on the foregoing, all Defendants are liable to Plaintiff for intentional infliction of emotional distress. Plaintiff has been damaged and seeks all damages to which she is entitled in an amount that exceeds the jurisdictional limits of all lower courts, including compensatory damages, punitive damages, attorneys' fees, costs of this action, and other forms of monetary and equitable relief to which she is entitled under the law.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### PUNITIVE DAMAGES

149.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in the entirety of this complaint, with the same force and effect as if set forth at length herein.

150.    Defendants' alleged unlawful, discriminatory, and/or unconstitutional actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff.

151.    By reason of the foregoing, plaintiff is entitled to punitive damages against the defendants in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of the action.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court grant judgment to her containing the following relief, jointly and severally, against Defendants:

a.        On Plaintiff's FIRST THROUGH SIXTEENTH Causes of Action, an award for actual damages against all Defendants and for punitive damages as set forth by law against Bill de Blasio and James O'Neill as a punishment, and in an amount sufficient to deter any future Mayor or Police Commissioner from engaging in the intentional discriminatory conduct the Defendants engaged in;

b. An award to Plaintiff of double her actual damages in an amount to be determined at trial as liquidated damages under 29 U.S.C. § 626(b);

c.        An award to Plaintiff of the costs of this action, together with her reasonable attorneys' fees; and

d        Such other and further relief that this Court finds just and proper.

## JURY DEMAND

Plaintiff demands a jury trial of all claims stated herein.

Dated:  New York, NY
        May 6, 2022

> */s/ John W. Moscow*
> John W. Moscow
> A.  Mackenna White
> LEWIS BAACH KAUFMANN MIDDLEMISS
> PLLC
> The Chrysler Building
> 405 Lexington Avenue, 62nd Floor
> New York, NY 10174
> T: (212) 826-7001
> F: (212) 826-7146
> john.moscow@lbkmlaw.com
> mackenna.white@lbkmlaw.com

_/s/ Louis C. Lapietra_

Louis C. La Pietra
LA PIETRA & KRIEGER, P.C.
30 Glenn Street, Suite 105
White Plains, NY 10603
T: (914) 684-6000
lou@lapietrakrieger.com

*Attorneys for Plaintiff*